```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - :
NADIA TARAZI and MICRONUTRIENT    :    13 Civ. 1024 (LAK) (JCF)
SOLUTIONS,                        :
                                  :            REPORT AND
            Plaintiffs,           :         RECOMMENDATION
                                  :
     - against -                  :
                                  :
TRUEHOPE INC., OPEN MIND          :
CONSULTING, INC., DANA RAY        :
STRINGAM, AUTUMN STRINGAM,        :
QUINTESSENTIAL BIOSCIENCES, LLC,  :
THE SYNERGY GROUP OF CANADA, INC., :
AND ANTHONY STEPHAN,              :
                                  :
            Defendants.           :
- - - - - - - - - - - - - - - - - - :
TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:
```

The plaintiffs, Nadia Tarazi and Micronutrient Solutions, Inc. ("MSI"), bring this action against alleged former business partners Dana and Autumn Stringam; the Stringams' company, Open Mind Consulting ("Open Mind"); the companies the Stringams now work with, Truehope, Inc. ("Truehope") and Quintessential Biosciences, LLC ("Q Sciences"); Truehope's alleged alter ego, the Synergy Group of Canada, Inc. ("Synergy"); and the Chief Executive Officer and controlling shareholder of both Synergy and Truehope, Anthony Stephan.  The defendants, with the exception of Mr. Stephan, move to dismiss most of Ms. Tarazi's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the doctrine of res judicata.  For the reasons that follow, I recommend that Synergy's motion to dismiss be granted, and that the motions of Open Mind and the Stringams, Truehope, and Q Sciences be granted in part and denied in part.

Background

     Central to this dispute is a "micronutrient formula" (the "Micronutrient Product") that was originally designed as a treatment for swine. (Second Amended Complaint ("SAC"), ¶¶ 17-18). A "human version" of the product was developed by Mr. Stephan and David Hardy, an animal feed formulator, to "help human sufferers of bipolar disorder." (SAC, ¶ 17). Once the product "proved to be successful on [Mr.] Stephan's children," including Autumn Stringam, Truehope began commercially marketing it in Canada. (SAC, ¶¶ 17-18). Ms. Tarazi first became aware of Ms. Stringam and the Micronutrient Product through Ms. Stringam's book, A Promise of Hope, which details her "experience with bipolar disorder and the successful management of her symptoms with [the Micronutrient Product]." (SAC, ¶ 15). Thereafter, Ms. Tarazi, Ms. Stringam, and Ms. Stringam's husband, Dana Stringam, agreed to work together to "use [Ms.] Stringam's story to distribute and sell supplement products" in the United States. (SAC, ¶ 16).

     A.   The Agreements

     This lawsuit arises out of a series of intertwined agreements related to the distribution of the Micronutrient Product. For ease of reference, I will lay out the various transactions here.

     1.   The Joint Venture Agreement

     Ms. Tarazi and the Stringams allegedly formed a joint venture in January or February 2012, with the goal of selling a private label version of the Micronutrient Product in the United States. (SAC, ¶ 28). The Joint Venture Agreement comprised "a number of

oral and written commitments" (SAC, ¶ 28), and certain aspects of
it were more formally documented at a later time (SAC, ¶ 31).

### 2.   Painted Wings Operating Agreement

In connection with the Joint Venture, Ms. Tarazi and Ms.
Stringam formed Painted Wings Media, LLC ("Painted Wings"), with
the goal of "developing and commercializing [Ms.] Stringam's life
story and the benefits of micronutrients over various media."
(SAC, ¶ 32).  The formation of this company was allegedly set forth
in the Painted Wings Operating Agreement on April 27, 2012.
(Plaintiff's Memorandum of Law in Opposition to Defendants Open
Mind Consulting, Inc., Dana Ray Stringam and Autumn Stringam's
Motion to Dismiss ("Pl. Stringam Opp.") at 5).

### 3.   Transmedia Assignment Agreement

On May 15, 2012, Ms. Stringam allegedly entered into the
Transmedia Assignment Agreement with Painted Wings, which assigned
the exclusive right to her name, likeness, and life story to
Painted Wings.  (SAC, ¶ 33; Pl. Stringam Opp. at 5).

### 4.   The Exclusivity Agreement

On July 5, 2012, the Stringams entered into the Marketing and
Distributorship Agreement (the "Exclusivity Agreement") with
Truehope.  (SAC, ¶ 40).  This agreement provided the Stringams with
"an exclusive perpetual license to market, sell or distribute the
private label Micronutrient Product in the United States" and to
use Truehope trademarks.  (SAC, ¶ 40 (brackets omitted)).

3

### 5.   The Assignment Agreement

In July or August 2012, the Stringams signed the Micronutrient Assignment Agreement (the "Assignment Agreement"), which assigned the Exclusivity Agreement to MSI in connection with the Joint Venture.  (SAC, ¶ 45; Assignment Agreement, attached as Exh. B to SAC).

### 6.   The Memorandum of Understanding

On August 17, 2012, a memorandum of understanding (the "MOU") was signed by the Stringams, on behalf of themselves and Open Mind, and Ms. Tarazi, on behalf of herself and MSI.  (SAC, ¶ 43; MOU, attached as Exh. A to SAC).  The MOU sets forth various aspects of the Joint Venture, including the manner in which decisions would be made, the legal structure of the Joint Venture, and the shared ownership of the Joint Venture by Open Mind and MSI.  It incorporated the Assignment Agreement by reference.  (MOU at 2-3).

### 7.   Letter Agreement

Also on August 17, 2012, Mr. Stringam and Ms. Tarazi, on behalf of themselves and Open Mind and MSI, respectively, entered into a letter agreement, which annexed and incorporated by reference the MOU, the Exclusivity Agreement, and the Assignment Agreement.  (SAC, ¶ 46; Letter Agreement, attached as Exh. C to SAC).  The Letter Agreement, written by Ms. Tarazi and signed in confirmation by Mr. Stringam, stipulates that "[b]y signing this agreement, you [] represent and warrant that you have obtained any required authorizations relating to the [] assignment of the [Exclusivity] Agreement."  (Letter Agreement).

4

8.   <u>Endorsement Agreement</u>

Finally, on August 17, 2012, Ms. Tarazi and Ms. Stringam signed a document on behalf of MSI and Painted Wings, respectively, entitled "Memo Agreement between [MSI] and Painted Wings" (the "Endorsement Agreement").   (SAC, ¶ 47; Endorsement Agreement, attached as Exh. D to SAC).   This agreement sets forth the commission and other fees Ms. Stringam would receive in exchange for her "personal endorsement of [MSI's] products," as well as certain confidentiality requirements.   (Endorsement Agreement at 1).

B.   <u>Transactions Between Truehope and MSI</u>

During the fall of 2012, Truehope took steps to enable MSI to distribute the Micronutrient Product, which included designing and purchasing private labels for the product bearing MSI's name and logo.   (SAC, ¶¶ 51-52).   On October 31, 2012, Truehope generated a purchase order instructing its manufacturer to provide MSI with 1,000 bottles of Micronutrient Product bearing the MSI label. (SAC, ¶ 52).   Additionally, Mr. Stephan agreed to provide a second product, Aminos Plus+, to the Joint Venture, and instructed Truehope's manufacturer to provide 300 bottles of this product to MSI.   (SAC, ¶ 53).

In December 2012, the Joint Venture prepared to launch its products by providing it to vendors and preparing advertising and promotional activities.   (SAC, ¶¶ 61-62).

C.   <u>Q Sciences</u>

On December 6, 2012, Mr. Stephan informed the Stringams that

5

Truehope had entered into an agreement with Q Sciences to distribute the Micronutrient Product in the United States. (SAC, ¶ 64). While the Stringams initially assured Ms. Tarazi that they would work to enforce the Joint Venture's rights under the Exclusivity Agreement (SAC, ¶¶ 66-68), by December 17, 2012, they were working with Q Sciences to market their private label version of the Micronutrient Product, Q96 (SAC, ¶ 70).

D.   Procedural History

In January 2013, Truehope filed suit in Alberta, Canada, against Ms. Tarazi, MSI, the Stringams, and Open Mind. (Truehope, Inc.'s Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint ("Truehope Memo.") at 1); Tarazi v. Truehope, Inc., 958 F. Supp. 2d 428, 431 (S.D.N.Y. 2013). Truehope sought in that action to invalidate the Assignment Agreement on the ground that the Exclusivity Agreement was not assignable without Truehope's consent. (Truehope Memo. at 1). Ms. Tarazi and MSI filed this lawsuit in February 2013. In July 2013, I stayed this action pending the resolution of the Canadian case, predicting (incorrectly, as it turns out) that a ruling in favor of Truehope as to the meaning of the Exclusivity Agreement in the Canadian court would resolve this action. Tarazi, 958 F. Supp. 2d at 435, 438-39.

On June 17, 2014, the Honorable D.K. Miller of the Alberta Court ruled that the Stringams did not have the right to assign the Exclusivity Agreement without Truehope's consent, and that the Assignment Agreement was therefore void. Truehope, Inc. v.

6

Stringam, 2014 ABQB 386, 241 A.C.W.S. 3d 772, paras. 25, 39 (Can. Alb. Q.B.).  The court further noted that Truehope, Ms. Tarazi, and MSI had all agreed that all issues other than the "assignability of the [Exclusivity Agreement] and whether it had been assigned . . . could be determined in the United States action," and therefore declared that all issues remaining between those parties were to be determined here.  Id., paras. 40-41.

Discussion

    A.   Legal Standard

    To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  While a complaint need not make "detailed factual allegations," it must contain more than mere "'labels and conclusions' or '[f]ormulaic recitation[s] of the elements of a cause of action.'"  Id. (quoting Twombly, 550 U.S. at 555).  A complaint with "'naked assertions' devoid of 'further factual enhancement'" is insufficient.  Id. (quoting Twombly, 550 U.S. at 557).  Further, where the complaint's factual allegations permit the court to infer only a possible, but not a plausible, claim for relief, it fails to meet the minimum standard.  Id. at 679.  In ruling on a motion to dismiss, the court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."

GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd., 580 F. Supp. 2d 321, 327 (S.D.N.Y. 2008) (quoting Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004)).

In assessing a motion to dismiss, a court must take as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 110-11 (2d Cir. 2010). However, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

B.    Choice of Law

When a federal court sits in diversity, it applies the choice of law rules of the forum state, here New York. See Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941). In this case, all parties' briefs "assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law." Arch Insurance Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009) (alteration in original) (quoting Golden Pacific Bancorp v. FDIC, 273 F.3d 509, 514 n.4 (2d Cir. 2000)); see In re Parmalat Securities Litigation, 479 F. Supp. 2d 332, 342 n.56 (S.D.N.Y. 2007) (where neither party submits evidence on foreign law, court may presume it is equivalent to local law). Accordingly, I will apply New York substantive law.

I will also apply New York law to determine the preclusive

effect of the Canadian judgment.   In determining the preclusive effect of foreign judgments in diversity cases, federal courts tend to apply the law of the forum state.   See Alfadda v. Fenn, 966 F. Supp. 1317, 1329 (S.D.N.Y. 1997) ("[A] federal court should normally apply either federal or state law, depending on the nature of the claim, to determine the preclusive effect of a foreign country judgment.").   While New York courts often assess the preclusive effect of foreign judgments without specifying the source of the applicable law, see id. at 1326; Alesayi Beverage Corp. v. Canada Dry Corp., 947 F. Supp. 658, 666 n.15 (S.D.N.Y. 1996), some courts have assumed that the law of the foreign jurisdiction applies, see Kirch v. Liberty Media Corp., No. 04 Civ. 667, 2006 WL 3247363, at *9 & n.14 (S.D.N.Y. Nov. 8, 2006) (listing New York cases); cf. RA Global Services, Inc. v. Avicenna Overseas Corp., 843 F. Supp. 2d 386, 389 n.2 (S.D.N.Y. 2012) (finding that New York law "incorporates to a limited extent the foreign jurisdiction's law" and "does not give more conclusive effect to a foreign judgment than it would be accorded by the courts of the jurisdiction in which it was rendered").   In any event, because no party has submitted evidence on Canadian preclusion law, I will assume it mirrors New York law.   See Parmalat Securities Litigation, 479 F. Supp. 2d at 342 n.56.

C.   Claims Against Synergy

The Second Amended Complaint adds Synergy as a defendant and alleges that Synergy is an "alter ego" of Truehope.   (SAC, ¶ 8). Synergy construes all claims asserted against Truehope to be

9

asserted against Synergy under an alter ego theory, and moves to dismiss on the ground that alter ego liability has not been sufficiently pled. (The Synergy Group of Canada, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Second Amended Complaint ("Synergy Memo.") at 1). The plaintiffs argue that they have in fact "define[d] 'Truehope' as including both companies," and have therefore made "allegations of direct, active wronging [] against both corporations," and only alleged alter ego liability in the alternative. (Plaintiffs' Memorandum of Law in Opposition to the Synergy Group of Canada, Inc.'s Motion to Dismiss ("Pl. Synergy Opp.") at 3-4). Indeed, the complaint notes, "for the purposes of this Amended Complaint, Synergy Group and Truehope, Inc. shall be referred to collectively as 'Truehope.'" (SAC, ¶ 9).

The plaintiffs' argument is circular. Essentially, the plaintiffs argue that Synergy and Truehope are alter egos; that because they are alter egos, it is impossible to know which actor caused which injury; and that therefore each can be sued directly.[1]

---

[1] The plaintiffs cite numerous cases to establish that "alternate joinder of defendants" is permissible when "the plaintiff is entitled to relief from someone, but the plaintiff does not know which of two or more defendants is liable under the circumstances." (Pl. Synergy Opp. at 4). None of these cases, however, relates to the context at issue, where the two defendants alleged to be directly liable are also alleged to be alter egos. See Smith v. Lenawee County, 505 F. App'x 526, 540 (6th Cir. 2012) (medical malpractice case where it was unknown which negligent conduct by medical staff proximately caused decedent's death); Block Industries v. DHJ Industries, Inc., 495 F.2d 256, 258 (8th Cir. 1974) (products liability case where plaintiff unaware which of four fabric manufacturers produced flammable fabric in question); Koc v. I-Flow Corp., 715 F. Supp. 2d 297, 302 (D.R.I. 2010) (products liability case where it was unknown which of several pharmaceutical manufacturers produced generic anaesthetic in question); American Insurance Co. v. St. Jude Medical, Inc., 597

As a result, the plaintiffs contend, even if the complaint does not adequately plead alter ego status, the claims against Synergy can be maintained. To allow a plaintiff to escape the burden of pleading the elements of alter ego liability by claiming that the alter ego relationship makes both companies liable directly would create an absurd loophole. Furthermore, though the plaintiffs purport to have made direct factual allegations against Synergy under the umbrella term of "Truehope," such allegations are too ambiguous to provide fair notice to Synergy of any direct claims. See Fed. R. Civ. P. 8(a) ("A pleading . . . must contain . . . a short and plain statement of the claim"); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial."). Indeed, the very paragraph that purports to define "Truehope" to mean "Truehope and Synergy" begins by stating that the two companies are alter egos. (SAC, ¶ 9). If the plaintiffs believe in good faith that there are claims that may properly be asserted against Synergy directly, the factual allegations in support of such claims should be spelled out in the complaint.

The question remains whether the plaintiffs have stated a claim for alter ego liability on which relief may be granted. It

_____

F. Supp. 2d 973, 976, 979 n.3 (D. Minn. 2009) (insurance liability case where it was unknown whether insurance company liable for coverage or, alternatively, insurance broker liable for misrepresenting coverage).

is well established that New York courts are reluctant to disregard the corporate form, and will do so only when it "has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 17-18 (2d Cir. 1996) (alteration in original) (quoting Gartner v. Snyder, 607 F.2d 582, 586 (2d Cir. 1979)). Where, as here, a plaintiff has not pled a fraud claim, she may nonetheless sufficiently plead an "alter ego" theory by "identify[ing] some non-fraudulent wrong attributable to the defendant's complete dominion of the corporation in question." United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 223 (S.D.N.Y. 2002) (alteration in original).

New York courts consider the following factors to determine whether complete dominion exists:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

Oppenheimer & Co., Inc. v. Deutsche Bank AG, 09 Civ. 8154, 2010 WL 743915, at *4 (S.D.N.Y. March 2, 2010) (quoting MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d

12

Cir. 2001)).

The plaintiffs allege that Synergy developed the Micronutrient Product and owns the trademark under which it is distributed in Canada, EMPowerplus. (SAC, ¶ 9). Although Truehope markets and licenses the product, it does not have a written agreement with Synergy regarding the use of Synergy's trademark. (SAC, ¶ 9). Mr. Stephan, the Chief Executive Officer and controlling shareholder of both companies, testified in the Canadian action that he was uncertain whether the personnel responsible for selling EMPowerplus were paid by Truehope or Synergy, and that Truehope "had no assets." (SAC, ¶ 9). He further testified that Truehope's online sales "come through [Synergy]," though the complaint notes that the only website for the group is www.truehope.com. (SAC, ¶ 9).

These allegations are not sufficient to state a claim for alter ego liability. The plaintiffs have not alleged that one company controls the other, that the companies' funds or profits are co-mingled, that they share office space, or that they have shared ownership or personnel other than Mr. Stephan. Other than the fact that there is no written agreement regarding Truehope's use of the EMPowerplus trademark, they have also not alleged a disregard for corporate formalities. Furthermore, even if the alleged facts were sufficient to establish complete dominion, the plaintiff has not alleged that either company "misused the corporate form . . . so as to commit a fraud or wrongdoing [against Ms. Tarazi or MSI] or avoid any of its obligations." TNS Holdings, Inc. v. MKI Securities Corp., 92 N.Y.2d 335, 340, 680 N.Y.S.2d 891,

893 (1998); accord MWH International, Inc. v. Inversora Murten,
S.A., No. 11 Civ. 2444, 2015 WL 728097, at *12 (S.D.N.Y. Feb. 11,
2015); see also Kafshi v. Philbro-Salomon, Inc., 628 F. Supp. 727,
735 (S.D.N.Y. 1986) ("There must be a showing of bad faith or
fraud, in order to overcome the presumption of separateness.").
Accordingly, the plaintiffs have not stated a plausible claim for
alter ego liability, and the claims against Synergy should be
dismissed.

> D.   Breach of Contract by the Stringams and Open Mind

The plaintiffs allege that the Stringams breached the Joint
Venture Agreement and the Assignment Agreement; that Mr. Stringam
and Open Mind breached the Letter Agreement and the MOU; and that
Ms. Stringam breached the Endorsement Agreement. (SAC, ¶¶ 102-06).
The Stringams and Open Mind move to dismiss only the breach of
contract claims against Ms. Stringam. (Memorandum of Law in
Support of Defendants Open Mind Consulting, Inc., Dana Ray
Stringam, and Autumn Stringam's Motion to Dismiss Plaintiff's
First, Second, Sixth, Seventh, and Ninth Causes of Action in the
Second Amended Complaint ("Stringam Memo.") at 2-3).

> 1.   Joint Venture Agreement

The plaintiffs allege that in January or February 2012,
through "a number of oral and written commitments," Ms. Tarazi and
the Stringams entered into the Joint Venture, with the purpose of
"selling a private label version of the Micronutrient Product."
(SAC, ¶ 28). They claim that the Stringams breached the Joint
Venture Agreement by promoting and selling the Micronutrient

14

Product of a competitor, Q Sciences, and by using Ms. Stringam's story to sell the competing product.  (SAC, ¶ 102).

Surprisingly, the Stringams do not move to dismiss this contract claim as against Mr. Stringam, while simultaneously arguing that no joint venture was formed.  (Stringam Memo. at 2-3, 5).  They contend that, if a joint venture was formed at all, it was not formed until several months later, and comprised the Letter Agreement, the MOU, and the Assignment Agreement.  (Reply Memorandum of Law in Further Support of Defendants Open Mind Consulting, Inc., Dana Ray Stringam, and Autumn Stringam's Motion to Dismiss Plaintiff's First, Second, Sixth, Seventh, and Ninth Causes of Action in Plaintiff's Second Amended Complaint ("Stringam Reply") at 2).  However, the appropriate inquiry is whether the facts that the plaintiffs allege gave rise to a contract are sufficient to state a claim for relief under a contract theory.

To recover for breach of contract under New York law, a plaintiff must prove: (1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages.  See <u>First Investors Corp. v. Liberty Mutual Insurance Co.</u>, 152 F.3d 162, 168 (2d Cir. 1998); <u>Palmetto Partners, L.P. v. AJW Qualified Partners</u>, 83 A.D.3d 804, 806, 921 N.Y.S.2d 260, 264 (2d Dep't 2011).  "To establish the existence of an enforceable agreement, the plaintiff must demonstrate 'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.'" <u>Beautiful Jewelers Private Ltd. v. Tiffany & Co.</u>, 438 F. App'x 20, 22 (2d Cir. 2011)

(quoting Kowalchuck v. Stroup, 61 A.D.3d 118, 121, 873 N.Y.S.2d 43, 46 (1st Dep't 2009)).  The plaintiff must also allege the "essential terms of the parties' purported contract in nonconclusory language, including the the specific provisions of the contract upon which liability is predicated," and must "clearly identify which contract provisions were breached as a result of the defendant's conduct." Broughel v. Battery Conservancy, No. 07 Civ. 7755, 2009 WL 928280, at *5 (S.D.N.Y. March 30, 2009).

The plaintiffs allege that in January or February 2012, Ms. Tarazi and the Stringams agreed through a number of communications to form a joint venture with the goal of marketing the Micronutrient Product in the United States.  (SAC, ¶ 28).  The parties evinced their intent to be joint venturers by, for example, working together to film Ms. Stringam's story as promotional material for the product.  (SAC, ¶ 29).  Ms. Tarazi claims that she scaled down her other business endeavors to invest time and money in the Joint Venture (SAC, ¶ 30), and that she and the Stringams agreed to share profits and losses (SAC, ¶ 101).  The plaintiffs acknowledge that "certain aspects of the[] Joint Venture" were later "more formally document[ed]" through the Letter Agreement, the MOU, and the Assignment Agreement (SAC, ¶ 31), but maintain that the Joint Venture itself predates these written agreements.

The Stringams do not dispute or even directly address the plaintiffs' claim that this alleged series of events in early 2012 formed a joint venture or an agreement enforceable under the law of contract.  However, "a district court has the power to dismiss a

16

complaint <u>sua</u> <u>sponte</u> for failure to state a claim, so long as the plaintiff is given notice and an opportunity to be heard." <u>Wachtler v. County of Herkimer</u>, 35 F.3d 77, 82 (2d Cir. 1994). It is not possible to discern from the facts alleged what would constitute performance under the supposed contract or which provisions, if any, were breached. Because these allegations do not meet the requirements to state a claim for breach of contract, I recommend that the breach of contract claim relating to the Joint Venture Agreement be dismissed but that the plaintiffs be given leave to re-plead.

　　　　　2.　<u>Assignment Agreement</u>

　　　　The plaintiffs claim that the Assignment Agreement, which purported to assign the Stringams' interests under the Exclusivity Agreement to MSI, constituted an enforceable contract. (SAC, ¶ 103). They allege that the Stringams breached the Assignment Agreement by falsely representing that they had the authority to assign the Exclusivity Agreement at the time the Assignment Agreement was entered. (SAC, ¶ 103). Ms. Stringam asserts that while she signed the Assignment Agreement, it represented "nothing more than a gift . . . to the [Joint Venture]." (Stringam Reply at 3).

　　　　It is not necessary to address the merits of this claim if it is precluded by the Canadian judgment, which squarely addressed the validity of the Assignment Agreement. While neither of the Stringams moves to dismiss this claim on preclusion grounds, the court "may raise [this] defense[] on those defendants' behalves,"

17

Marcelin v. Cortes-Vasquenz, No. 09 CV 4303, 2010 WL 5665037, at *3
n.4 (E.D.N.Y. Dec. 9, 2010), and it is in the interest of judicial
economy to do so, see Salahuddin v. Jones, 992 F.2d 447, 449 (2d
Cir. 1993) (per curiam); Rene v. Jablonski, No. 08 CV 3968, 2009 WL
2524865, at *8 n.4 (E.D.N.Y. Aug. 17, 2009).  Furthermore, Truehope
has articulated this argument in support of its motion to dismiss
the related claims against Truehope.  (Truehope Memo. at 6-12).
Accordingly, the plaintiffs have not only been put on notice of the
argument for preclusion, but have responded to it in opposing
Truehope's motion to dismiss.  (Plaintiffs' Memorandum of Law in
Opposition to Truehope, Inc.'s Motion to Dismiss ("Pl. Truehope
Opp.") at 8-12).

     "United States courts are not obligated to recognize judgments
rendered by a foreign state, but may choose to give res judicata
effect to foreign judgments on the basis of comity."  Films by
Jove, Inc. v. Berov, 250 F. Supp. 2d 156, 176 (E.D.N.Y. 2003)
(emphasis omitted) (quoting Gordon & Breach Science Publishers S.A.
v. American Institute of Physics, 905 F. Supp. 169, 178-79
(S.D.N.Y. 1995)).   "In New York, courts generally will accord
recognition to the judgments rendered in a foreign country under
the doctrine of comity absent a showing of fraud in the procurement
of the foreign judgment or unless recognition of the foreign
judgment would offend a strong policy of New York."  Allstate
Insurance Co. v. Administratia Asigurarilor de Stat, 962 F. Supp.
420, 425 (S.D.N.Y. 1997).  I issued the July 2013 stay order after
balancing the obligation to exercise the jurisdiction of the

federal courts with the principles of international comity -- "the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." Tarazi, 958 F. Supp. 2d at 432-33; see Royal and Sun Alliance Insurance Co. of Canada v. Century International Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006); Ole Media Management, L.P. v. EMI April Music, Inc., No. 12 Civ. 7249, 2013 WL 2531277, at *2 (S.D.N.Y. June 10, 2013). Because the then-pending Canadian action had the potential to resolve the validity of the Assignment Agreement, thereby "undermining the claims here," I found that a stay was appropriate. Tarazi, 958 F. Supp. 2d at 435, 438-39.

It is now clear from the text of the Canadian judgment that it does in fact resolve this contract claim. Justice Miller found, based on the "undisputed evidence, and the characterization of the evidence by [Ms.] Tarazi and MSI," that there was "no merit to the claim that there was a valid assignment" of the Exclusivity Agreement under Alberta law. Truehope, Inc., 2014 ABQB 386, para. 38. Accordingly, the Assignment Agreement was declared null and void, id., para. 39, and cannot be the basis for a breach of contract claim, see Clark v. Buffalo Wire Works Co., 3 F. Supp. 2d 366, 372 n.5 (W.D.N.Y. 1998) ("A void contract . . . cannot be enforced because there is no meeting of the minds and thus no agreement." (citing Durante Bros. and Sons, Inc. v. Flushing National Bank, 755 F.2d 239, 252 (2d Cir. 1985)). No party argues that it was denied due process or lacked the incentive to fully litigate this claim in the Canadian proceeding, nor does any party

allege that the ruling was procured by fraud.  Accordingly, in the interests of comity and judicial efficiency, the plaintiffs' claim that the Stringams breached the Assignment Agreement should be dismissed.

### 3.   Letter Agreement and MOU

The plaintiffs, in opposing the Stringams' motion to dismiss, contend that Ms. Stringam is a "party to the Letter Agreement and its annexes [] as a non-signatory."  (Pl. Stringam Opp. at 11). This argument is of no moment, because the plaintiffs have not in fact pled that Ms. Stringam breached the Letter Agreement or the MOU -- this claim is only asserted against Mr. Stringam and Open Mind  (SAC, ¶ 104), who have not moved to dismiss it.  It is therefore not necessary now to address whether a claim has been stated.

### 4.   Endorsement Agreement

The plaintiffs' final breach of contract claim against Ms. Stringam asserts that she breached the Endorsement Agreement by "endorsing the competing products of Q Sciences[] and refusing to endorse MSI products."  (SAC, ¶ 105).  The Stringams and Open Mind do not directly discuss this claim in their opening memorandum, but merely state that "the only contracts on which Plaintiffs could legitimately base their breach of contract claims were signed by Mr. Stringam on behalf of Open Mind -- not [Ms.] Stringam." (Stringam Memo. at 3).  However, in their reply brief, these parties argue that the language of the Endorsement Agreement does not obligate Ms. Stringam to endorse MSI products, let alone to do

so exclusively; it simply sets forth the compensation terms in the event that she chooses to endorse MSI products. (Stringam Reply at 3).

Because this argument was raised only in reply, the plaintiffs have not had the opportunity to respond to it. "Typically, a court 'need not consider' arguments 'raised for the first time in [a party's] reply brief.'" Fink v. Time Warner Cable, 810 F. Supp. 2d 633, 648 n.9 (S.D.N.Y. 2011) (quoting Thomas v. Roach, 165 F.3d 137, 145-46 (2d Cir. 1999)). "This policy is in place to protect a party from unfair surprise by a legal argument that has not been researched and addressed." Id. Furthermore, while the language of the Endorsement Agreement appears on its face to support the defendants' interpretation, it is not without ambiguity. For example, while the agreement does not expressly state that Ms. Stringam is obligated to endorse, it appears to presumes the existence of such an obligation. (Endorsement Agreement at 1 ("I am happy to outline below the agreed commission and fee structure to ensure that you benefit from your endorsement of [MSI] and its products.")). Because the defendants' hasty discussion of the plaintiffs' breach of contract claims (Stringam Memo. at 2-3) did not put the plaintiffs on notice of this argument, and because the language of the Endorsement Agreement does not foreclose the possibility that relief may be granted on this claim, I recommend that the motion to dismiss this claim be denied.

D.   Breach of Fiduciary Duty

The plaintiffs claim that the Joint Venture gave rise to a fiduciary duty, which the Stringams breached by "abandoning the Joint Venture, promoting and selling the Micronutrient Product of a competitor, Q Sciences, and [] using [Ms.] Stringam's life story to sell Q Sciences' competing product." (SAC, ¶¶ 108-111). The Stringams move to dismiss this claim, arguing that their transaction with Ms. Tarazi was not a joint venture but an arm's length commercial transaction that did not give rise to a fiduciary duty and that, regardless of whether any fiduciary duty was owed, the claim is duplicative of the breach of contract claim. (Stringam Memo. at 4-6). I will address each argument in turn.

   1.   Existence of Fiduciary Duty

Under New York law, the elements of a cause of action for breach of fiduciary duty are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Communications, Inc., 660 F.3d 131, 138 (2d Cir. 2011) (citing Barrett v. Freifeld, 64 A.D.3d 736, 739, 884 N.Y.S.2d 305, 308 (2d Dep't 2009)). "Under New York law, '[a] fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" Krys v. Butt, 486 F. App'x 153, 154 (2d Cir. 2012) (alteration in original) (quoting EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19, 799 N.Y.S.2d 170, 175 (2005)).

   Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present

22

> in the marketplace between those involved in arm's length
> business transactions.  Generally, where parties have
> entered into a contract, courts look to that agreement to
> discover the nexus of the parties' relationship and the
> particular contractual expression establishing the
> parties' interdependency.  If the parties do not create
> their own relationship of higher trust, courts should not
> ordinarily transport them to the higher realm of
> relationship and fashion the stricter duty for them.

Id. (quoting EBC I, Inc., 5 N.Y.3d at 19-20, 700 N.Y.S.2d at 175).

"At the heart of the fiduciary relationship lies reliance, and de

facto control and dominance."  Id. (quoting United States v.

Chestman, 947 F.2d 551, 568 (2d Cir. 1991)).  "[W]hen parties deal

at arm['s] length in a commercial transaction, no relation of

confidence or trust sufficient to find the existence of a fiduciary

relationship will arise absent extraordinary circumstances."

Boccardi Capital Systems, Inc. v. D.E. Shaw Laminar Portfolios,

LLC, 355 F. App'x 516, 519 (2d Cir. 2009) (second alteration in

original); see also Intellivision v. Microsoft Corp., 784 F. Supp.

2d 356, 372 (S.D.N.Y. 2011) ("Generally, commercial transactions do

not create fiduciary obligations, absent express language in the

contract or prolonged prior course of dealings between the parties

establishing the fiduciary relationship.").

The plaintiffs claim that the fiduciary duty in question

arises out of the parties' relationship as joint venturers.[2]

"Under New York law, participants in a joint venture owe one

another the same fiduciary duties that inhere between members of a

---

[2] As laid out below, the elements of a joint venture are distinct from the elements of a contractual agreement.  Therefore, the fact that I recommend dismissing the breach of contract claim under the Joint Venture Agreement does not foreclose the possibility that a joint venture was formed.

23

partnership." Argilus, LLC v. PNC Financial Services Group, Inc., 419 F. App'x 115, 119 (2d Cir. 2011) (citing Stem v. Warren, 185 A.D. 823, 830, 174 N.Y.S. 30, 34 (1919)). A "joint venture is formed when (a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses." SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004). A provision to share profits and losses is "indispensable" to the formation of a joint venture. Dinaco, Inc. v. Time Warner, Inc., 346 F.3d 64, 68 (2d Cir. 2003). "[E]ven where there is no express joint venture agreement, a joint venture may exist 'based upon the implied agreement evidenced by the parties' conduct.'" Sea Shipping Inc. v. Half Moon Shipping, LLC, 848 F. Supp. 2d 448, 458 (S.D.N.Y. 2012) (emphasis omitted) (quoting Richbell Information Services, Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 297, 765 N.Y.S.2d 575, 583 (1st Dep't 2003)). Thus, a joint venture may be created (with the attendant fiduciary duties) based on mutual commitments that are not sufficiently specific to give rise to a contract. For example, parties may agree generally to contribute resources to effect a common commercial goal, but the unilateral use of those resources by one party for its exclusive benefit would be a breach of fiduciary duty even in the absence of any contractual obligations.

24

As discussed above, the Stringams do not address the series of events which the plaintiffs claim created the joint venture in January or February 2012,[3] but argue that because the July agreements "contain no reference to the sharing of losses," they did not create a joint venture. (Stringam Memo. at 5). In the absence of any meaningful argument by the Stringams regarding the facts which allegedly created the joint venture, I find that the plaintiffs have plausibly claimed that one was formed. Accordingly, they have also plausibly alleged that this joint venture gave rise to a fiduciary duty between Ms. Tarazi and the Stringams.

2. <u>Duplicative Nature of Claims</u>

Nonetheless, a breach of fiduciary duty claim may be dismissed if it is duplicative of a breach of contract claim. <u>See</u> <u>Barbara v. MarineMax, Inc.</u>, No. 12 CV 368, 2012 WL 6025604, at *9 (E.D.N.Y. Dec. 4, 2012) ("If the breach of fiduciary duty claim indeed arises from the duties imposed by the [contract], the claim is duplicative of the breach of contract claim, and is therefore subject to dismissal."). A breach of fiduciary duty claim is duplicative when it is "based on allegations of fiduciary wrongdoing that 'are [] expressly raised in [a] plaintiff's breach of contract claim.'"

---

[3] As described in the breach of contract section, these factual allegations include that the parties agreed to form a joint venture with the goal of marketing the Micronutrient Product (SAC, ¶ 28), that they evinced their intent to be joint venturers by working together to film Ms. Stringam's story for promotional materials (SAC, ¶¶ 29-30), that Ms. Tarazi scaled down other business endeavors to focus her time and resources on the Joint Venture (SAC, ¶¶ 29-30), and that the parties agreed to share profits and losses (SAC, ¶ 101).

Balta v. Ayco Co., 626 F. Supp. 2d 347, 360 (W.D.N.Y. 2009)
(quoting Brooks v. Key Trust Co. National Ass'n, 26 A.D.3d 628,
630, 809 N.Y.S.2d 270, 272 (3d Dep't 2006)).  In other words, "a
plaintiff may not maintain both a contract claim and a breach of
fiduciary duty claim, without 'allegations that, apart from the
terms of the contract, the parties created a relationship of higher
trust than would arise from their contracts alone, so as to permit
a cause of action for breach of fiduciary duty independent of the
contractual duties.'"  Id. at 360-61 (quoting Brooks, 26 A.D.3d at
630, 809 N.Y.S.2d at 272-73).

Because I recommend dismissing the contract claim under the
Joint Venture Agreement, the argument that the fiduciary duty claim
is duplicative may be moot.  However, even if the plaintiffs were
to successfully re-plead that claim, they would likely be entitled
to pursue a fiduciary duty claim as an alternative theory of
liability.  The defendants dispute the plaintiffs' claim that an
enforceable contract was created in early 2012, arguing that no
contract was formed until the Letter Agreement, the MOU, and the
Assignment Agreement were signed several months later.  Because it
is possible that, as the defendants contend, the alleged Joint
Venture Agreement is not an enforceable contract, it would be
premature to dismiss the fiduciary duty claim as duplicative.  Cf.
Foster v. Kovner, 44 A.D.3d 23, 29-30, 840 N.Y.S.2d 328, 333-34
(1st Dep't 2007) (allowing contract claim and fiduciary duty claim
regarding same allegations to proceed concurrently).  Accordingly,
I recommend that the motion to dismiss this claim be denied.

F.    Constructive Trust

The Stringams and Open Mind move to dismiss the claim for constructive trust solely on the ground that this cause of action cannot stand if the fiduciary duty claims are dismissed. (Stringam Memo. at 6 (citing Rosenblatt v. Christie, Manson & Woods, Ltd., 195 F. App'x 11, 13 (2d Cir. 2006)).   Because their motion to dismiss the breach of fiduciary duty claim should be denied, the motion to dismiss this claim should be, as well.

G.    Accounting

The plaintiffs argue that the Stringams should be required to provide an accounting because they "owed fiduciary duties to their Joint Venture partners" and nonetheless "diverted opportunities belonging to the Joint Venture," gaining "a significant financial benefit as a result."  (SAC, ¶¶ 132-34).

"Under New York law, an accounting is a distinct cause of action rooted in equity.  Such action seeks an adjustment of the accounts of the parties and a rendering of judgment for the balance ascertained to be due." DiTolla v. Doral Dental IPA of New York, LLC, 469 F.3d 271, 275 (2d Cir. 2006) (internal citation omitted). Generally, a plaintiff must allege "(1) a relationship of a fiduciary or confidential nature; (2) money or property entrusted to the defendant imposing upon him the burden of accounting; (3) the absence of an adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." Matsumura v. Benihana National Corp., No. 06 Civ. 7609, 2007 WL 1489758, at *4 (S.D.N.Y. May 21, 2007).

27

Where there is a fiduciary relationship between the parties, it is not necessary to allege wrongdoing on the part of the defendant, Adam v. Cutner & Rathkopf, 238 A.D.2d 234, 242, 656 N.Y.S.2d 753, 759 (1st Dep't 1997); Morgulas v. J. Yudell Realty, Inc., 161 A.D.2d 211, 213-14, 554 N.Y.S.2d 597, 600 (1st Dep't 1990); In re Gershenoff, 2 Misc. 3d 847, 850, 774 N.Y.S.2d 644, 646 (N.Y. Sup. Ct. 2003), and there is an "absolute right to an accounting notwithstanding the existence of an adequate remedy at law," Koppel v. Wein, Lane & Malkin, 125 A.D.2d 230, 234, 509 N.Y.S.2d 327, 330 (1st Dep't 1986) (collecting cases).   In assessing whether members of a partnership (or joint venture, see Argilus, 419 F. App'x at 119) have been allocated their fair share of partner distributions, courts may consider among other things whether "any profits [have been] derived by [any partner] without the consent of the other partners from . . . any use by him of [the partnership's] property."   N.Y. Partnership Law § 43(1); accord Sriraman v. Patel, 761 F. Supp. 2d 7, 17 (E.D.N.Y. 2011).

The Stringams argue that the plaintiffs have not identified which, if any, "money or property" was entrusted to them (Stringam Memo. at 7).   But the plaintiffs indicate in their opposition brief that the property entrusted to the Stringams included business and marketing plans, websites and social media sites, marketing strategies, and the hours Ms. Tarazi spent "training the Stringams, strategizing for the Joint Venture, and executing the plans laid out for the Joint Venture." (Pl. Stringam Opp. at 20; SAC, ¶¶ 36, 84, 130).   Novel business plans and other intellectual property can

28

indeed provide the basis for a claim for an accounting. Cf. Alliance Security Products, Inc. v. Fleming Co., 471 F. Supp. 2d 452, 460-62 (S.D.N.Y. 2007) (finding business and marketing plans insufficiently novel to support claims for accounting). Thus, apart from Ms. Tarazi's "expenditure of effort," the items that she purportedly contributed to the joint venture are conceivably the basis for an accounting, and motion to dismiss this claim should be denied.

    H.   Effect of Canadian Judgment on Claims Againt Truehope

Truehope argues that regardless of whether the plaintiffs have stated any plausible claims, all claims against Truehope should be dismissed because they are precluded by the Canadian action. (Truehope Memo. at 6-8). Because this argument could obviate the need to determine whether the plaintiffs's claims against Truehope are otherwise plausible, I will address it before assessing Truehope's arguements as to individual claims.

Although none of the plaintiffs' present claims against Truehope were adjudicated in the Canadian action,[4] Truehope asserts that they could have been raised and are therefore barred by the doctrine of res judicata. (Truehope Memo. at 6). However, it is clear from the text of the Canadian decision that the plaintiffs' claims against Truehope are not precluded.

"[W]here the court in the first action has expressly reserved

_____

    [4] The plaintiffs' claims against Truehope in this court are for aiding and abetting breach of fiduciary duty (SAC, ¶¶ 112-117), promissory estoppel (SAC, ¶¶ 118-122), tortious interference with contract (SAC, ¶¶ 123-127), spoliation (SAC, ¶¶ 139-142), and breach of contract (SAC, ¶¶ 148-152).

the litigant's right to maintain the second action," res judicata does not apply. Chevron Corp. v. Donziger, 886 F. Supp. 2d 235, 292 (S.D.N.Y. 2012) (internal brackets omitted); see also Landau P.C. v. LaRossa, Mitchell & Ross, 11 N.Y.3d 8, 14, 862 N.Y.S.2d 316, 320 (2008) ("[I]t would be inequitable to preclude a party from asserting a claim under the principle of res judicata [] where . . . [t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action." (third alteration in original)).  Furthermore, a judgment will not preclude the litigation of related claims in a later action where the parties themselves have agreed "in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein." Restatement (Second) of Judgments § 26(1)(a).  Justice Miller's decision states:

> In oral argument, [Truehope] agreed that after the issues of the assignability of the [Exclusivity Agreement], and whether it had been assigned, were determined, all other issues could be determined in the United States action. This was the result sought by Nadia Tarazi and MSI. Given these positions and the findings in this decision, it is therefore not necessary for this Court to address [whether Alberta is the appropriate forum to determine the remaining issues between the parties].
>
> . . . . Any issues remaining between [Truehope], Nadia Tarazi and MSI are to be determined in the United States action.

Truehope, Inc., 2014 ABQB 386, paras. 40-41.  It is therefore clear that not only did Justice Miller expressly reserve Ms. Tarazi's right to maintain the claims here against Truehope, but Truehope acquiesced to this limitation on the effect of the Canadian judgment.  Accordingly, Truehope's motion to dismiss all claims

against it on preclusion grounds should be denied.   Truehope's
other arguments as to these claims are discussed below.

I.    Aiding and Abetting Breach of Fiduciary Duty

The plaintiffs claim that Truehope, Q Sciences, and Mr.
Stephan aided and abetted the Stringams' breach of fiduciary duty.
(SAC, ¶¶ 113-17).   Truehope and Q Sciences move to dismiss this
claim for several reasons.   First, they, like the Stringams, argue
that the fiduciary duty claim is duplicative of the contract claim,
and that this claim accordingly must also fail.   (Truehope Memo. at
14-15; Defendant Quintessential Biosciences, LLC dba Q Sciences'
Memorandum of Law in Support of Motion to Dismiss ("Q Sciences
Memo.") at 5-6).   Second, also like the Stringams, they argue that
this claim must fail because no fiduciary duty existed.   For the
reasons already stated, these first two arguments fail.   Third,
Truehope and Q Sciences argue that the plaintiff has not
sufficiently pled that either defendant knowingly induced or
participated in the breach of such duty.   (Truehope Memo. at 15-16;
Truehope, Inc.'s Reply Memorandum of Law in Further Support of its
Motion to Dismiss Plaintiffs' Second Amended Complaint ("Truehope
Reply") at 7; Q Sciences Memo. at 7-8).

To prevail on a claim for aiding and abetting a breach of
fiduciary duty, a plaintiff must show "(1) a breach by a fiduciary
of obligations to another, (2) that the defendant knowingly induced
or participated in the breach, and (3) that the plaintiff suffered
damage as a result of the breach." Meridian Horizon Fund, LP v.
KPMG (Cayman), 487 F. App'x 636, 643 (2d Cir. 2012) (quoting

Kaufman v. Cohen, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003)).   Although a plaintiff is not required to allege intent to harm, "there must be an allegation that [the] defendant had actual knowledge of the breach of duty." Id. (quoting Kaufman, 307 A.D.2d at 125, 760 N.Y.S.2d at 169).   "To satisfy the 'knowing participation element,' a plaintiff must show that the defendant provided 'substantial assistance' to the primary violator, which 'means more than just performing routine business services for the alleged fraudster.'" Id. (quoting Kaufman, 307 A.D.2d at 126, 760 N.Y.S.2d at 170; CRT Investments, Ltd. v. BDO Seidman, LLP, 85 A.D.3d 470, 472, 925 N.Y.S.2d 439, 441 (1st Dep't 2011)).   A defendant has provided "substantial assistance" if it has "affirmatively assist[ed], help[ed] conceal or fail[ed] to act when required to do so, thereby enabling the breach to occur." Kaufman, 307 A.D.2d at 126, 760 N.Y.S.2d at 170.

     1.   Truehope

Truehope asserts that the plaintiffs have not plausibly claimed that Truehope had knowledge of the Joint Venture because this allegation is based only on representations made by Ms. Stringam. (Truehope Memo. at 15).   However, a pleading need not be supported by personal knowledge to survive a motion to dismiss. The allegations in the Second Amended Complaint, taken as true, state a plausible claim that Truehope knowingly participated in the alleged breach of fiduciary duty.   The plaintiffs claim that Mr. Stephan expressed his support for the Stringam's partnership with Ms. Tarazi directly to Ms. Tarazi in April 2012. (SAC, ¶ 52).   In

October 2012, Truehope sent labels designed for MSI's sale of the Micronutrient Product and 1,000 bottles of the product to MSI. (SAC, ¶ 52). Furthermore, the plaintiffs allege that Mr. Stringam e-mailed Mr. Stephan in January 2013, seeking advice on "how to get out of the [Joint Venture]." (SAC, ¶ 71). These facts, if true, establish that Truehope was aware of the Stringams' duties pursuant to the Joint Venture through its Chief Executive Officer, Mr. Stephan. The complaint also plausibly alleges that Truehope affirmatively assisted the Stringams' alleged breach by working with Mr. Stringam to have the product returned from MSI's warehouse to the manufacturer. (SAC, ¶ 72). Accordingly, Truehope's motion to dismiss this claim should be denied.

2.   <u>Q Sciences</u>

Q Sciences argues that it could not have known about the Stringams' fiduciary duties because the Assignment Agreement was void. (Q Sciences Memo. at 7-8). The focus of this argument is misplaced. The proper inquiry is whether the plaintiffs have adequately pled that Q Sciences was aware of the Stringams' duties under the <u>Joint Venture</u> -- an arrangement which is alleged to have been formed several months before the Assignment Agreement was signed. The plaintiffs claim that their attorney informed Q Sciences about the Joint Venture in December 2012, after the Stringams and Ms. Tarazi were made aware that Truehope intended to provide the Micronutrient Product to Q Sciences. (SAC, ¶¶ 64-65). They further allege that in December 2012, the Chief Executive Officer of Q Sciences reassured the Stringams through various

33

communications that Q Sciences would support them if, upon the Stringams' breach of their duties under the Joint Venture, Ms. Tarazi and MSI "elected to defend their contractual rights." (SAC, ¶¶ 73-74). Finally, the plaintiffs claim that Q Sciences affirmatively enabled the alleged breach by incorporating the Stringams into their distribution scheme and centering Ms. Stringam's story in their promotional materials. (SAC, ¶¶ 75-78). These allegations are not mere conclusions and, taken as true, state a plausible claim for relief. Q Sciences' motion to dismiss the claim that it aided and abetted the Stringams' breach of fiduciary duty should therefore also be denied.

J.   Tortious Interference with Contract

The plaintiffs claim that Truehope and Q Sciences tortiously interfered with the Joint Venture Agreement, the MOU, and the Endorsement Agreement. (SAC, ¶¶ 123-127). Both defendants move to dismiss this claim on grounds similar to those raised in the fiduciary duty context -- that the plaintiffs have not plausibly alleged the defendants' knowledge of the contracts. (Truehope Memo. at 18-19; Q Sciences Memo. at 11-12). Q Sciences additionally argues that the plaintiffs have failed to sufficiently allege that they intentionally procured the Stringams' breach.[5]

Under New York law, "[t]ortious interference with contract

---

[5]   Q Sciences also argues that any interference with the Assignment Agreement could not have been tortious because that agreement was void. (Q Sciences Memo. at 11). However, the tortious interference with contract claim is not premised on breach of the Assignment Agreement, but on alleged breaches of the Joint Venture Agreement, MOU, and Endorsement Agreement (SAC, ¶¶ 124-127), none of which was voided by the Canadian judgment.

requires [1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." Valley Lane Industries Co. v. Victoria's Secret Direct Brand Manaqmeent, LLC, 455 F. App'x 102, 104 (2d Cir. 2012) (first alteration in original) (quoting Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 82 (1996)).

In opposing the motions of Truehope and Q Sciences, the plaintiffs rely on the same factual allegations used to support the claim that these defendants aided and abetted the alleged breach of fiduciary duty. (Pl. Truehope Opp. at 16; Plaintiffs' Memorandum of Law in Opposition to Defendant Quintessential Biosciences, LLC d/b/a Q Sciences' Motion to Dismiss ("Pl. Q Sciences Opp.") at 16-17). However, these factual allegations refer only to the defendants' knowledge of the Joint Venture Agreement -- not to any knowledge of the MOU or Endorsement Agreement.[6] (SAC ¶¶ 52, 70-74). Because the Second Amended Complaint fails to state a plausible contract claim related to the Joint Venture Agreement, a tortious interference claim cannot be premised on the breach of that agreement. See Valley Lane Industries Co., 455 F. App'x at

---

[6] The plaintiffs do allege that "upon information and belief," Q Sciences knew the rights to Ms. Stringam's life story "had been assigned to Painted Wings." (SAC, ¶ 73). However, they do not assert any claims pursuant to the Transmedia Assignment Agreement, the alleged agreement to which this paragraph refers. Rather, their claims regarding Ms. Stringam's obligations to Painted Wings are premised on the Endorsement Agreement. (SAC, ¶ 124).

104 (stating that first element of tortious interference with contract claim is "the existence of a valid contract between the plaintiff and a third party").   The plaintiffs provide no substantive support for their assertion that the defendants were aware of the MOU or Endorsement Agreement; the only reference to knowledge of the MOU and Endorsement Agreement is contained in the claim for relief, and stated as a legal conclusion.  (SAC, ¶ 124). Accordingly, this claim should be dismissed in its entirety.

  K. <u>Promissory Estoppel</u>

  The plaintiffs also assert a claim of promissory estoppel against Truehope based on Truehope's "clear and unambiguous promise to provide the Micronutrient Product and Aminos Plus+ to MSI and the Joint Venture for private-labeling sales in the United States." (SAC, ¶¶ 118-22).   Truehope moves to dismiss this claim on the ground that the plaintiffs "have failed to credibly allege any viable promises."  (Truehope Memo. at 16).

  Promissory estoppel has three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained in reliance on that promise.  <u>Cyberchron Corp. v. Calldata Systems Development, Inc.</u>, 47 F.3d 39, 44 (2d Cir. 1995); <u>Suthers v. Amgen</u>, 441 F. Supp. 2d 478, 486 (S.D.N.Y. 2006).

  The plaintiffs provide no detail on the alleged promise by Truehope, stating only that "Truehope made a clear and unambiguous promise to provide the Micronutrient Product and Aminos Plus+ to MSI and the Joint Venture for private-market labeling in the United

36

States," and that this promise was "reiterated through Truehope's words and actions on many occasions" (SAC, ¶ 119) -- for example, by shipping labels and a case of the product to MSI and by promoting the product's launch through social media (SAC, ¶¶ 52, 54; Pl. Truehope Opp. at 17).  Without conceding that the alleged promise is stated as a mere legal conclusion, the plaintiffs argue that the factual allegations regarding the "reiterations" of such promise are sufficient to establish a promise at the pleading stage.  (Pl. Truehope Opp. at 17-18).

However, promissory estoppel cannot be established absent a promise that is "clear and unambiguous in its terms."  Missignman v. USI Northeast, Inc., 131 F. Supp. 2d 495, 518 (S.D.N.Y. 2001) (contrasting elements of promissory estoppel with those of implied contract, which can be inferred from conduct); accord Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 62, 74 (E.D.N.Y. 2006).  Because the allegation of a promise is not supported by sufficient factual detail to be plausible, Iqbal, 556 U.S. at 678, the promissory estoppel claim should be dismissed.

L.   Breach of Contract by Truehope

The plaintiffs also bring a claim against Truehope for breach of contract premised on the alleged promise to provide Aminos Plus+ to the Joint Venture.  They allege that, having "agreed to provide" Aminos Plus+ and sent a shipment of the product to the MSI warehouse, Truehope then recalled the shipment and refused to provide any more product.  (SAC, ¶¶ 53, 72, 149-152).

37

These allegations are not sufficient to state a claim for breach of contract. As discussed above, a breach of contract claim must not only allege offer, acceptance, consideration, mutual assent, and intent to be bound, Beautiful Jewelers, 438 F. App'x at 22, but also the "'essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated,'" Broughel, 2009 WL 928280, at *5. The plaintiffs' bare allegations in support of this breach of contract claim do not include any essential terms. For example, there is no mention of the quantity of Aminos Plus+ to be provided, the terms of payment or any other form of consideration, or the duration of the arrangement. Furthermore, as the plaintiffs neglect to address this claim in their opposition to Truehope's motion, the claim may be deemed abandoned and dismissed on that basis. See Doe v. Columbia University, __ F. Supp. 3d __, __, 2015 WL 1840402, at *8 n.4 (S.D.N.Y. 2015) (deeming claim abandoned and therefore dismissing it where plaintiff did not respond to defendant's motion to dismiss claim); Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); cf. Jackson v. Federal Express, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition [to a motion for summary judgment] that relevant claims or defenses that are not defended have been

abandoned.").   For these reasons, the motion to dismiss the breach of contract claim against Truehope should be granted.

    M.   <u>Spoliation</u>

The plaintiffs claim that the Stringams, Truehope, and Mr. Stephan are liable for spoliation because, despite being aware of their obligation to preserve evidence for this litigation, they "knowingly dispensed of or destroyed their mobile phone and/or the messages contained therein containing relevant evidence to this case." (SAC, ¶¶ 139-142).   They request that these defendants be "sanctioned as a result in an amount to be determined at trial." (SAC, ¶ 142).   To the extent this claim is a request for sanctions under the Federal Rules of Civil Procedure, it is not properly considered in a motion to dismiss.   To the extent the plaintiffs seek to assert a tort claim for spoliation, it should be dismissed.

"Spoliation of evidence, whether first-party or third-party, and whether intentional or negligent, is not a valid cause of action under New York law." <u>Baltazar v. Petland Discounts, Inc.</u>, No. 13 CV 5139, 2014 WL 3347889, at *2 (E.D.N.Y. May 22, 2014) (quoting <u>Landis v. Remington Arms Co.</u>, 11 CV 1377, 2012 WL 6098269, at *4 (N.D.N.Y. Dec. 7, 2012)).   "Although there [has been] some discussion about circumstances in which courts should recognize spoliation as an actionable tort," some of which the plaintiffs cite, New York courts addressing the question "ha[ve] declined to do so." <u>Landis</u>, 2012 WL 6098269, at *4; <u>Ortega v. City of New York</u>, 9 N.Y.3d 69, 83, 845 N.Y.S.2d 773, 787 (2007) (rejecting cause of action for third-party spoliation); <u>Hillman v. Sinha</u>, 77

A.D.3d 887, 888, 910 N.Y.S.2d 116, 117 (2d Dep't 2010) (declining to recognize cause of action for first-party spoliation and relying on reasoning in <u>Ortega</u>). Accordingly, I recommend that the plaintiffs' spoliation claims be dismissed against all defendants.

N.   <u>Unjust Enrichment</u>

The plaintiff alleges that Q Sciences was unjustly enriched by its "misappropriat[ion of] Tarazi and MSI's marketing materials, as well as the marketing and sales expertise provided by Plaintiffs to Dana and Autumn Stringam in connection with the promotion of [Ms. Stringam's] life story and the sale of micronutrient products." (SAC, ¶ 145). Q Sciences moves to dismiss this claim on two grounds -- that its relationship with the plaintiff is "too attenuated" and that an unjust enrichment claim cannot proceed concurrently with a valid contract claim. (Q Sciences Memo. at 14-16).

While courts may not extend liability for unjust enrichment to defendants who are entirely removed from the transaction in question, <u>see</u> <u>Marini v. Adamo</u>, 12 F. Supp. 3d 549, 552-53 (E.D.N.Y. 2014) (declining to extend liability for unjust enrichment to wife of fraudster who was not involved in fraud scheme), Q Sciences is not so remote. The plaintiffs allege that Q Sciences affirmatively encouraged Ms. Stringam to abandon the Joint Venture by promising to support her and her husband if the plaintiffs brought suit and inviting them into its distribution scheme. (SAC, ¶¶ 73-78). They further claim that Q Sciences then worked with Ms. Stringam to use marketing materials produced by Ms. Tarazi to promote Q Sciences'

micronutrient product instead of MSI's, resulting in Q Sciences' unjust enrichment. (SAC, ¶ 145). These facts, if proven, are not too attenuated to support a claim of unjust enrichment.

Q Sciences' argument that this claim is duplicative of the plaintiffs' breach of contract claims against the Stringams also fails. While unjust enrichment, as an equitable cause of action, is "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff," Corsello v. Verizon NY, Inc., 18 N.Y.3d 777, 790, 994 N.Y.S.2d 732, 740 (2012), an unjust enrichment claim may be pleaded in the alternative to other claims, Barnet v. Drawbridge Special Opportunities Fund LP, No. 14 Civ. 1376, 2014 WL 4393320, at *21 (S.D.N.Y. Sept. 5, 2014) (citing Fed. R. Civ. P. 8(a)) (declining to dismiss unjust enrichment claim as duplicative of contract claim or aiding and abetting breach of fiduciary duty claim). I have recommended that the contract claim under the Joint Venture be dismissed, and it is possible that, as Ms. Stringam argues, the Endorsement Agreement did not contractually obligate her to endorse MSI's products nor to refrain from endorsing competitors' products. Therefore, the plaintiffs' unjust enrichment can proceed as an alternative to such contract claims at this juncture.

O.   Unfair and Deceptive Business Practices

Finally, the plaintiffs claim that Q Sciences has engaged in unfair business practices contrary to New York General Business Law

("GBL") § 349(h) by using Ms. Stringam's story to market its product "in violation of the Endorsement Agreement and Autumn Stringam's agreements with Painted Wings." (SAC, ¶¶ 153-155). The plaintiffs allege that this conduct is "consumer-oriented" and is "deceptive and misleading in a material way" because it "suggest[s to consumers] that [Q Sciences] is permitted to use Autumn Stringam and her life story to endorse its products." (SAC, ¶¶ 156-159). Such conduct, the plaintiffs claim, is therefore "likely to result in consumer injury and harm to the public interest," and has damaged MSI. (SAC, ¶¶ 160-161).

As an initial matter, the plaintiffs did not defend this claim in opposing Q Sciences' motion, and therefore appear to have abandoned it. See Doe, __ F. Supp. 3d at __, 2015 WL 1840402, at *8 n.4; Chamberlain, 986 F. Supp. 2d at 392. Furthermore, this claim does not present a plausible ground for relief because it does not allege genuine harm or risk of harm to consumers or the public interest.

To establish a claim for deceptive business practices under GBL § 349, a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam). Although GBL § 349 is a consumer protection statute, corporate competitors have standing to enforce it in "certain limited circumstances." Feel Better Kids, Inc. v. Kids in Need, Inc., No. 06 CV 23, 2012 WL 4483000, at *8 (E.D.N.Y.

Aug. 28, 2012) (citing Gucci America, Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003)). "New York State and Second Circuit courts have been skeptical of Section 349 claims involving private contract disputes between two parties, neither of which is a consumer." Spin Master Ltd. v. Bureau Veitas Consumer Products Services, Inc., No. 08 CV 923, 2011 WL 1549456, at *3 (W.D.N.Y. March 7, 2011). In order for a non-consumer to have standing, the "gravamen of the complaint must be consumer injury or harm to the public interest," and the plaintiff must "allege conduct that has significant ramifications for the public at large." Gucci America, 277 F. Supp. 2d at 273; see also Greenlight Capital, Inc. v. Greenlight (Switzerland) S.A., No. 04 Civ. 3136, 2005 WL 13682, at *6 (S.D.N.Y. Jan. 3, 2005). "[C]ourts routinely reject a competitor's Section[] 349 . . . claim[] if 'the gravamen of the complaint is . . . harm to plaintiff's business' rather than harm to the public interest in New York at large." 4 K&D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 548, n.13 (S.D.N.Y. 2014) (second alteration in original) (quoting Emergency Enclosures, Inc. v. National Fire Adjustment Co., 68 A.D.3d 1658, 1661, 893 N.Y.S.2d 414, 417-18 (2009)).

Here, the plaintiffs have stated conclusorily that Q Sciences' alleged misleading conduct was "consumer-oriented" and likely to cause harm, but have not provided any explanation of how this conduct would plausibly impact consumers or the public interest. Rather, it is clear that the gravamen of this claim is the alleged injury to MSI. Such a claim cannot be sustained under GBL § 349,

43

and should be dismissed.

Conclusion

For the foregoing reasons, I recommend that Synergy's motion to dismiss (Docket no. 88) be granted, and that the motions to dismiss filed by the Stringams and Open Mind (Docket no. 75), Q Sciences (Docket No. 78), and Truehope (Docket no. 81) be denied in part and granted in part. This resolution would entail dismissing the following claims: all claims against Synergy; the breach of contract claim premised on the Assignment Agreement (Claim 1, SAC, ¶ 103); the promissory estoppel claim (Claim 4); the tortious interference with contract claim (Claim 5); the claim for accounting (Claim 7), as asserted against Mr. Stringam; the spoliation claim (Claim 9); the breach of contract claim against Truehope (Claim 11); and the unfair and deceptive business practices claim (Claim 12). I recommend that the breach of contract claim premised on the Joint Venture Agreement (Claim 1, SAC, ¶ 102) be dismissed with leave to re-plead. I recommend that the motions to dismiss be denied as to the following claims: the breach of contract claim premised on the Endorsement Agreement (Claim 1, SAC, ¶ 105); the breach of fiduciary duty claim (Claim 2); the aiding and abetting breach of fiduciary claim (Claim 3); the claim for constructive trust (Claim 6); the claim for accounting (Claim 7), as asserted against Ms. Stringam; and the unjust enrichment claim (Claim 10).[7]

---

[7] Note that this report and recommendation does not address the defamation claim (Claim 8), which was not the subject of any motion. Additionally, as Mr. Stephan has not filed a motion to

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, Room 2240, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       July 1, 2015

Copies transmitted this date to:

James D. Bailey, Esq.
Bailey Duquette P.C.
100 Broadway, 10th Floor
New York, NY 10005

Alon Markowitz, Esq.
Markowitz Law Group, P.C.
10 E. 40th St., 33rd Floor
New York, NY 10016

J. Angus Edwards, Esq.
Jones Waldo Holbrook & McDonough, P.C.
170 S. Main St,. Suite 1500
Salt Lake City, UT 84101

---

dismiss, this recommendation would leave intact the claim against him for aiding and abetting breach of fiduciary duty (Claim 3).

Evan K. Farber, Esq.
Sarah Levitan, Esq.
Reed Smith LLP
599 Lexington Ave.
New York, NY 10022

Zachary P. Galacek, Esq.
Reed Smith LLP
225 Fifth Ave.
Pittsburgh, PA 15222-2716

Ariel Berschadsky, Esq.
Law Office of Ariel Berschadsky
199 State Street, 8th Floor
Brooklyn, N.Y. 11201